1
2
3
4
5
6
7
8               IN THE UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10  RANDY D. YOUNG,

11            Plaintiff,                No. 2:11-cv-1283 CMK (TEMP)

12       vs.

13  COMMISSIONER OF SOCIAL
    SECURITY,
14

15            Defendant.              MEMORANDUM OPINION AND ORDER

16  _____/

17            Plaintiff brings this action for judicial review of a final decision of the

18  Commissioner of Social Security under 42 U.S.C. § 405(g).  Pursuant to the written consent of

19  all parties, this case is before the undersigned as the presiding judge for all purposes, including

20  entry of final judgment.  See 28 U.S.C. § 636(c).  Pending before the court are plaintiff's motion

21  for summary judgment (Doc. 17) and defendant's cross-motion for summary judgment (Doc. 18).

22  For the reasons discussed below, the court will deny plaintiff's motion for summary judgment

23  and grant defendant's cross-motion for summary judgment.

24
25
26

## I. PROCEDURAL HISTORY[1]

Plaintiff, born on May 7, 1982, applied for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI, respectively, of the Social Security Act on May 7, 2007, alleging an onset of disability on February 1, 2006 primarily due to mental impairments. Certified Administrative Record ("CAR") 17, 69-70, 152-58, 159-66. Specifically, plaintiff claims disability due to attention deficit hyperactivity disorder ("ADHD"), bipolar disorder, anxiety, mood swings, depression, borderline intellectual functioning, as well as abdominal pain. CAR 45, 51, 199-208.

Plaintiff's claim was denied initially and upon reconsideration. CAR 76-80, 88-92. Plaintiff requested an administrative hearing, which was held on September 22, 2009 before Administrative Law Judge ("ALJ") Stanley R. Hogg. CAR 31-68. In a January 20, 2010 decision, the ALJ concluded that plaintiff was not disabled[2] based on the following findings:

---

[1] Because the parties are familiar with the factual background of this case, including plaintiff's medical history, the undersigned does not exhaustively relate those facts here. The facts related to plaintiff's impairments and medical history will be addressed insofar as they are relevant to the issues presented by the parties' respective motions.

[2] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq. Supplemental Security Income ("SSI") is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq. Under both provisions, disability is defined, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A five-step sequential evaluation governs eligibility for benefits. See 20 C.F.R. §§ 423(d)(1)(a), 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The following summarizes the sequential evaluation:

> Step one:  Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
> Step two:  Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
> Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
> Step four:  Is the claimant capable of performing his past

1.   The claimant meets the insured status requirements of the Social Security Act through September 30, 2008.

2.   The claimant has not engaged in substantial gainful activity since February 1, 2006, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3.   The claimant has the following severe impairments: Attention Deficit Hyperactivity Disorder (ADHD), personality disorder and borderline intellectual functioning (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels that involves simple routine tasks that have no frequent dealings with the public and do not require good reading and writing skills.

6.   The claimant has no past relevant work background (20 CFR 404.1565 and 416.965).

7.   The claimant was born on May 7, 1982 and was 23 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.   The claimant has a 10th grade limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

10.  The claimant has not been under a disability, as defined in the Social Security Act, from February 1, 2006 through the date of this

work? If so, the claimant is not disabled.  If not, proceed to step five.
     Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).  The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Bowen, 482 U.S. at 146 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.

1    decision (20 CFR 404.1520(g) and 416.920(g)).

2    CAR 17-26.  After the Appeals Council declined review on March 24, 2011, this appeal

3    followed.  CAR 1-6.

4    ## II.  STANDARD OF REVIEW

5          The court reviews the Commissioner's final decision to determine whether it is:

6    (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

7    whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is

8    more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521

9    (9th Cir. 1996).  It is "such evidence as a reasonable mind might accept as adequate to support a

10   conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including

11   both the evidence that supports and detracts from the Commissioner's conclusion, must be

12   considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v.

13   Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's

14   decision simply by isolating a specific quantum of supporting evidence.  See Hammock v.

15   Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  However, if substantial evidence supports the

16   administrative findings, or if there is conflicting evidence supporting a particular finding, the

17   finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th

18   Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation,

19   one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas

20   v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

21   standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th

22   Cir. 1988).

23   ## III.  DISCUSSION

24          Plaintiff argues that: A. The ALJ improperly evaluated plaintiff's physical

25   impairments at step two of the sequential evaluation process; B. The ALJ improperly assessed

26   plaintiff's mental residual functional capacity ("RFC"); C. The ALJ improperly rejected the

4

1  opinion of plaintiff's treating psychiatric nurse practitioner; D. The ALJ failed to properly

2  analyze the effects of plaintiff's obesity on his mental impairments and pain; E. The ALJ

3  improperly discredited the testimony of plaintiff and plaintiff's mother, as well as third party

4  written statements; and F. The ALJ erred by failing to obtain vocational expert ("VE") testimony

5  regarding plaintiff's non-exertional limitations at step five of the sequential evaluation process.[3]

6  ### A.    PHYSICAL IMPAIRMENTS

7           Plaintiff contends that the ALJ improperly found that plaintiff's pancreatitis

8  and/or abdominal pain was not a severe impairment at step two because it did not exist for a

9  period of at least 12 months.  20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii), 416.909,

10 416.920(a)(4)(ii).  Plaintiff also argues that the ALJ should have ordered a consultative

11 evaluation regarding plaintiff's physical RFC.

12         The record shows that plaintiff first reported abdominal pain in October 2000.

13 CAR 533-35.  At that time, plaintiff was diagnosed with abdominal pain of unclear etiology and

14 possible ulcer disease, but plaintiff refused nasogastric intubation and was discharged home.

15 CAR 534.  Subsequently, on January 6, 2008, plaintiff again reported severe abdominal pain after

16 eating at fast food restaurants the previous day (with a previous episode two weeks prior).  CAR

17 558-60.  An ultrasound indicated that plaintiff had multiple stones in his gallbladder and

18 gallbladder removal was recommended, but plaintiff indicated that he did not want the procedure

19 done.  CAR 559.  The medical records indicate that plaintiff subsequently was admitted to have

20 the surgery, but became impatient and left when the surgery was delayed by a couple of hours.

21 CAR 569.  Several months later, on August 2, 2008, plaintiff returned to the emergency room

22 with abdominal pain, and a CT scan revealed that he had gallstones with no evidence of bile duct

23 dilatation or inflammation, bowel obstruction, or free air.  CAR 310-12, 569-71.  Plaintiff's

24

25         [3] Although plaintiff raised these issues in a different order, the court addresses the issues
   in an order that more logically comports with the sequential evaluation process used in Social
26 Security cases.

1  gallbladder was then removed on August 22, 2008.  CAR 298-300.

2          Thereafter, plaintiff continued to complain of abdominal pain, and between

3  February and May of 2009 was hospitalized multiple times for abdominal pain and suspected

4  pancreatitis at Mercy Medical Center.  However, on May 8, 2009, Drs. Lim and Leung, doctors at

5  U.C. Davis Medical Center, determined that his symptoms were likely the result of bile duct

6  stones as opposed to chronic pancreatitis.  CAR 755-57.  This diagnosis was confirmed when

7  several bile duct stones were surgically removed on May 22, 2009, and Drs. Lim and Leung

8  opined that plaintiff's pancreatitis was likely due to these removed bile duct stones.  CAR 759-

9  62.  The record contains no further medical records documenting treatment for abdominal pain or

10 pancreatitis.

11         In light of the above, there is substantial evidence that plaintiff suffered from

12 severe abdominal pain and/or pancreatitis between August 2008 and May 2009.  Although there

13 are medical records documenting abdominal pain as early as October 2000 and January 2008, as

14 noted above, plaintiff refused treatment at those times and did not return with further complaints

15 until August 2008.  At the hearing, plaintiff himself suggested that his stomach problems began

16 primarily after his gallbladder removal in August 2008 and that he stopped doing in-home

17 support service work for his mother since he got hospitalized in 2009.  CAR 46, 50-51.

18 Additionally, even though plaintiff testified at the September 22, 2009 hearing that he continued

19 to experience frequent abdominal pain that wakes him up at night up to four times per week and

20 can last 1.5-2 hours at a time, there are no further medical records documenting treatment for

21 abdominal pain after removal of plaintiff's bile duct stones in May 2009.  CAR 47-48.  Even if

22 plaintiff did not have insurance and lacked access to medical care[4] as he suggests, plaintiff also

23 testified that he does not take any over-the-counter medication for the pain, because he has a

24 "pretty high pain tolerance," is "almost immune to it now," and it feels like "it's a everyday

25

26         [4] Plaintiff testified that he was no longer being seen by his primary care provider(s) at
Mercy Family Health, because he had missed too many appointments.  CAR 52.

thing." CAR 52.  As such, plaintiff's own testimony suggests that any residual abdominal pain has no more than a minimal effect on his functioning.

While it is clear that plaintiff's abdominal pain and/or pancreatitis constituted a severe impairment between August 2008 and May 2009, substantial evidence supports the ALJ's finding that it did not exist for a period of at least twelve months.[5]  Accordingly, a physical consultative examination was not warranted, because the existing evidence and plaintiff's testimony supported a finding that the durational requirement was not satisfied.  Thus, the ALJ did not err at step two.

## B.   MENTAL RESIDUAL FUNCTIONAL CAPACITY

The ALJ found that, due to plaintiff's functional limitations resulting from his ADHD, personality disorder, and borderline intellectual functioning, plaintiff had the RFC "to perform a full range of work at all exertional levels that involves simple routine tasks that have no frequent dealings with the public and do not require good reading and writing skills."  CAR 21.

In formulating this RFC, the ALJ gave significant weight to the opinion of consultative examiner and clinical neuropsychologist, Dr. Jeffery Shively, who examined plaintiff on August 22, 2007.  (CAR 265-69.)  Dr. Shively assessed plaintiff's functional ability as follows:

> The claimant's history suggests a reading disorder, with probable borderline intellectual functioning and untreated ADHD.  He was apparently diagnosed as having bipolar disorder at one time with a positive response to lithium but was subsequently told by a psychiatrist he did not have bipolar disorder but an attitude problem.  Bipolar disorder seems to be an unresolved diagnosis and needs to be considered a rule out condition.

---

[5] Plaintiff correctly notes that the ALJ erroneously stated that plaintiff's abdominal pain began in January 2009.  CAR 20.  However, any such error is harmless because, as discussed above, plaintiff's severe abdominal pain and/or pancreatitis between August 2008 and May 2009 still do not satisfy the 12-month durational requirement.

1    His ability to understand, remember, and carry out complex
     instructions appears poor.

2

3    His ability to understand, remember, and carry out simple
     instructions appears good based on his work history as a cook.

4    His ability to maintain concentration, attention and persistence
     appears poor.

5

6    His ability to perform activities within a schedule and maintain
     regular attendance appears to range from fair to good.

7    His ability to complete a normal workday and workweek without
     interruptions from psychologically based symptoms appears fair.

8

9    His ability to respond appropriately to changes in a work setting
     appears to range from poor to fair based on his history of conflict
     with supervisors.

10

11   CAR 268-69.  Dr. Shively assessed plaintiff with a GAF score of 55-60.[6]  CAR 269.

12              As an initial matter, plaintiff generally argues that the ALJ's RFC assessment does

13   not reflect a detailed assessment of itemized functions and limitations required at step four and

14   five of the sequential evaluation process.  SSR 96-8p provides, in part, that:

15              The psychiatric review technique...requires adjudicators to assess
                an individual's limitations and restrictions from a mental
16              impairment(s) in categories identified in the "paragraph B" and
                "paragraph C" criteria of the adult mental disorders listings.  The
17              adjudicator must remember that the limitations identified in the
                "paragraph B" and "paragraph C" criteria are not an RFC
18              assessment but are used to rate the severity of mental
                impairment(s) at steps 2 and 3 of the sequential evaluation process.
19              *The mental RFC assessment used at steps 4 and 5 of the sequential
                evaluation process requires a more detailed assessment by
20              itemizing various functions contained in the broad categories
                found in paragraphs B and C of the adult mental disorders listings
21              in 12.00 of the Listing of Impairments....*"

22

23

24        [6]  GAF is a scale reflecting "psychological, social, and occupational functioning on a
     hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental
     Disorders 34 (4th ed. 2000) ("DSM IV").   According to the DSM IV, a GAF of 51-60 indicates
25   "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR
     moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with
26   peers or co-workers)."  Id.

1  SSR 96-8p, at *4.[7]  Here, although the ALJ did not literally re-state all of Dr. Shively's above-

2  mentioned functional assessments in the RFC, he outlined each of them in the decision and then

3  translated them into an RFC.  Provided that the ALJ properly considered the assessed limitations

4  in formulating the RFC, there is no requirement that the RFC literally re-state all of the assessed

5  limitations.  20 C.F.R. § 404.1545 (defining RFC as "the most you can still do despite your

6  limitations.")  Indeed, relatively recent Ninth Circuit authority made clear that it is entirely

7  appropriate for an ALJ to synthesize and translate assessed limitations into an RFC.  Stubbs-

8  Danielson v. Astrue, 539 F.3d 1169, 1173-74 (9th Cir. 2008).

9          Plaintiff also argues, more specifically, that the ALJ's translation and formulation

10  of the RFC did not adequately capture all of Dr. Shively's assessed functional limitations, in

11  particular Dr. Shively's assessments that plaintiff had a poor ability to maintain concentration,

12  attention, and persistence; a poor to fair ability to respond appropriately to changes in a work

13  setting; and a fair ability to complete a normal workday and workweek without interruptions

14  from psychologically based symptoms.  CAR 268-69.  However, the ALJ did provide a rationale

15  for reconciling these ratings with Dr. Shively's other assessments.  After outlining Dr. Shively's

16  assessed limitations, the ALJ reasoned:

17              However, the claimant has the ability to carry out simple
               instructions and maintain a regular work schedule and ability to
18              complete a workweek without distraction.  Thus the assessment
               that the claimant's concentration is poor does not militate against a
19              finding that he can do simple routine tasks.

20  CAR 24.  In short, the ALJ concluded that while plaintiff's ability to concentrate generally is

21  poor, Dr. Shively's assessment that plaintiff has a good ability to perform simple instructions and

22  at least a fair ability to work within a schedule and complete a workday and workweek suggests

23  that concentration difficulties could be mitigated when he is limited to simple, routine tasks that

24  do not require extensive concentration and persistence.  Although the ALJ did not explicitly state

25  _____

26          [7] Plaintiff does not challenge the ALJ's finding with respect to listing at step 3.

1  so, the same can also be reasonably inferred from his decision with respect to responding to

2  changes in a work setting.  Magallanes v. Bowen, 881 F.2d 747, 755 (9th Cir. 1989) ("As a

3  reviewing court, we are not deprived of our faculties for drawing specific and legitimate

4  inferences from the ALJ's opinion.")  A position with simple, routine tasks that involves no

5  frequent dealings with the public would logically involve a reduced amount of change in the

6  work setting, thereby addressing plaintiff's poor to fair ability to respond appropriately to

7  changes in a work setting.  Thus, the ALJ's interpretation of Dr. Shively's functional assessment,

8  including his resolution of any potential internal inconsistency or ambiguity in the assessment,

9  was rational, reasonable, and supported by substantial evidence.  See Stubbs-Danielson, 539 F.3d

10  at 1174 (holding that an ALJ's assessment of a claimant adequately captures restrictions related

11  to concentration, persistence or pace where the assessment is consistent with restrictions

12  identified in the medical testimony).

13          Additionally, although plaintiff suggests that the ALJ impermissibly omitted from

14  the RFC assessment a limitation regarding plaintiff's inability to manage his funds in his best

15  interests, a close reading of Dr. Shively's report suggests that this limitation was largely based on

16  plaintiff's own opinion:

17          The claimant reports he is incapable of managing his funds and
           based on this self-report does not appear capable of managing his
18          funds in his best interests.

19  CAR 269.  This comment also does not appear in the "functional ability" portion of Dr. Shively's

20  report.  CAR 268-69.  In any event, even if this limitation were fully credited, plaintiff's inability

21  to manage his personal finances does not necessarily suggest that plaintiff cannot perform simple,

22  routine tasks in a work environment.  SSR 96-8p, at *2 ("RFC is an administrative assessment of

23  the extent to which an individual's medically determinable impairment(s), including any related

24  symptoms ... may cause physical or mental limitations or restrictions that may affect his or her

25  capacity to do *work-related physical and mental activities*.") (emphasis added).

26          Finally, plaintiff argues that the component of the RFC stating that plaintiff is

10

1   limited to jobs that "do not require good reading and writing skills" does not adequately account

2   for evidence that plaintiff cannot read or write at all.  See e.g. CAR 40, 49 (plaintiff's testimony

3   that he never had a driver's license because he could not read the test).  However, even assuming

4   *arguendo* that plaintiff is truly illiterate and that the ALJ somewhat overstated his reading and

5   writing abilities, plaintiff's illiteracy is an educational factor that need not strictly be incorporated

6   into the RFC and need only be considered at step five of the sequential evaluation process.  20

7   C.F.R. § 404.1564 (defining education and literacy level as a vocational factor); 20 C.F.R. §

8   404.1560(b)-(c) (explaining that vocational factors are considered at step five).  More

9   importantly, the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (the

10  "Grids") indicate that plaintiff's alleged illiteracy as a younger individual age 18-44 in itself does

11  not militate in favor of disability at any exertional level – not even at the sedentary level:

12          While illiteracy or the inability to communicate in English may
            significantly limit an individual's vocational scope, the primary
13          work functions in the bulk of unskilled work relate to working with
            things (rather than with data or people) and in these work functions
14          at the unskilled level, literacy or ability to communicate in English
            has the least significance.  Similarly the lack of relevant work
15          experience would have little significance since the bulk of
            unskilled jobs require no qualifying work experience.  Thus, the
16          functional capability for a full range of *sedentary* work represents
            sufficient numbers of jobs to indicate substantial vocational scope
17          for those individuals age 18-44 even if they are illiterate or unable
            to communicate in English.
18

19  20 C.F.R. Part 404, Subpart P, Appendix 2, § 201.00(i) (emphasis added); see also 20 C.F.R. Part

20  404, Subpart P, Appendix 2, § 201.23 (directing that an illiterate individual age 18-44 limited to

21  sedentary work with no previous work experience is not disabled).  In this case, plaintiff is at

22  least able to communicate in English and is capable of performing work at all exertional levels.

23  Accordingly, any error in the assessment of plaintiff's literacy level is harmless.

24          **C.      TREATING SOURCE OPINION**

25          Plaintiff further contends that the ALJ improperly rejected the opinion of

26  plaintiff's treating psychiatric nurse practitioner from Shasta County Mental Health, Gina Davis.

On September 22, 2009, Ms. Davis completed a "Welfare-to-Work Exemption Request" form for purposes of the Shasta County CalWORKs Employment Services Program. CAR 243-44. Ms. Davis stated that plaintiff suffers from a chronic condition that renders him unable to work or participate in education or training on a full-time or even part-time basis. CAR 243. She opined that his condition became disabling on October 24, 2008 and was expected to last for his lifetime. CAR 243. In support of her opinion, she stated that plaintiff had anxiety problems, fatigue, was unable to focus and concentrate, had a problem with anger, and does not like to be around people. CAR 244. She also indicated that he had difficulty at home with chores and "getting little tasks done at home because of problems with focus." CAR 244. She noted that he does not require someone in the home to care for him and that he was able to care for his children at home. CAR 244. The ALJ gave Ms. Davis's opinion "minimal weight" on the grounds that the significant limitations assessed were not supported by objective evidence and that her opinion was "clearly beyond her level of expertise as a nurse practitioner" with no evidence that she was "working under the supervision of a psychologist or a psychiatrist." CAR 24.

Contrary to plaintiff's argument, Ms. Davis does not qualify as an "acceptable medical source." The regulations differentiate between opinions from "acceptable medical sources" and "other sources." See 20 C.F.R. §§ 404.1513(a), (d); 416.913(a), (d); see also SSR 06-03p, at *2 ("only 'acceptable medical sources' can be considered treating sources, as defined in 20 CFR 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight.") Nurse practitioners are specifically classified as "other sources," and their opinions may be accorded less weight than opinions from acceptable medical sources. Id.; Gomez v. Chater, 74 F.3d 967, 970-71 (9th Cir. 1996). In this case, as the ALJ noted, there was no indication that Ms. Davis worked closely under the supervision of a psychologist or psychiatrist. Although plaintiff was previously seen by other psychiatrists and/or psychologists at Shasta County Mental Health, the records do not indicate that they were treating him contemporaneously with Ms. Davis, and her "Welfare-to-Work Exemption Request" form was

signed only by her.  CAR 243-44.  Even if she had access to the other doctors' prior treatment

records, this does not necessarily mean that she was working under their supervision or

collaboratively with them.

Nevertheless, opinions from "other sources" are "important and should be

evaluated on key issues such as impairment severity and functional effects...."  SSR 06-03p, at

*3.  The regulations provide specific criteria for evaluating opinions from "acceptable medical

sources" – these include length of the treatment relationship, frequency of examination, nature

and extent of the treatment relationship, supportability, consistency, and specialization.  See 20

C.F.R. §§ 404.1527, 416.927.  Although the regulations do not explicitly address how to consider

opinions from "other sources," these same factors can be applied in evaluating evidence from

"other sources."  SSR 06-03p, at *4.

Here, the ALJ reasonably concluded that Ms. Davis's opinion was not supported

by objective evidence.  While a health care professional should certainly take into account the

claimant's reported symptoms in her evaluation, the court agrees that Ms. Davis's opinion as to

plaintiff's limitations appears to be based almost entirely on plaintiff's subjective complaints of

symptoms.  The form contains no objective test results or findings justifying the severe lifetime

disability assessed.  See 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents

relevant evidence to support an opinion, particularly medical signs..., the more weight we will

give that opinion.")  Ms. Davis also entirely fails to explain why plaintiff's symptoms as noted on

the form render him virtually incapacitated.  Id. ("The better an explanation a source provides for

an opinion, the more weight we will give that opinion.")

Furthermore, Ms. Davis's treatment notes from 2008 to 2009 do not remotely

support her finding of lifetime disability.  Although she indicated several times that plaintiff was

irritable, anxious, hyperactive, depressed, and experienced mood swings, she also fairly

consistently noted that he had a good appearance, goal directed thought process, grossly normal

memory, and intact insight and judgment.  CAR 739-47.  Plaintiff was advised to stop taking

marijuana and her notes reflect that his condition noticeably improved and deteriorated with medication compliance and non-compliance[8] respectively.  CAR 739-47.  A February 19, 2009 note indicates that plaintiff reported stopping all medications and that Ms. Davis instructed him to follow up as soon as possible.  CAR 748.  Thereafter, plaintiff missed a March 5, 2009 appointment with Ms. Davis, and the records show no further treatment notes until Ms. Davis saw plaintiff on September 17, 2009.  CAR 749-51.  At that time, Ms. Davis stated that plaintiff was anxious, had a very blunted affect, his anger was difficult to control, and noted "decompensation."  CAR 751.  However, she also reported that he was on no medication and that despite discussing the risks with plaintiff, he did not want to start any medication.  CAR 751.  A condition which can be controlled or corrected by medication is not disabling.  See Montijo v. Secretary of HHS, 729 F.2d 599, 600 (9th Cir.1984) (Addison's Disease controlled with medications not disabling); Odle v. Heckler, 707 F.2d 439, 440 (9th Cir.1983) (rib condition controlled with antibiotics not considered disabling).  A few days later, Ms. Davis filled out the "Welfare-to-Work Exemption Request" form assessing lifetime disability.  CAR 243-44, 752.

Additionally, plaintiff suggests that Ms. Davis's assessed limitations are consistent with other lower GAF scores in the record.  A low GAF score does not alone determine disability and is not essential to an RFC's accuracy, but is "a piece of evidence to be considered with the rest of the record."  Olds v. Astrue, 2008 WL 339757, at *4 (D. Kan. Feb. 5, 2008) (citation omitted).  An ALJ is permitted to discredit a GAF score where it is unsupported by objective evidence.  Clark v. Astrue, 2009 WL 542166, at *6 (C.D. Cal. Mar. 4, 2009).  Here, the ALJ noted that plaintiff had a GAF score of 45[9] upon hospitalization for pancreatitis, but

---

[8] For example, on November 12, 2008, Ms. Davis reported that plaintiff did not start his Abilify prescription "because of TV commercials."  CAR 741.  She also noted partial medication compliance on several other occasions.  See e.g CAR 744, 747.

[9] A GAF score between 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000).

1   stated that he assigned "minimal weight to such a conclusion as it is an isolated assessment and

2   not substantiated by additional objective findings." CAR 24. Indeed, the 2-page February 26,

3   2009 hospital assessment largely recounted plaintiff's historic account of his mental issues, noted

4   restlessness and irritability, and contained no remarkable findings. CAR 644-45. Moreover,

5   according to Ms. Davis's February 19, 2009 note, plaintiff had already stopped taking his

6   medications for several days at the time of the hospital assessment. CAR 748. Although the ALJ

7   did not explicitly address the other low GAF score of 44 assessed on May 5, 2008, the same

8   reasoning applies to this score taken at a time when plaintiff just started regular treatment at

9   Shasta County Mental Health and was about to begin a medication regimen. CAR 716. The

10  assessment also showed that plaintiff had a GAF score of 53 within the previous year. CAR 716.

11          Moreover, Ms. Davis's severe assessment contrasted notably with the assessments

12  of consulting examiner and neuropsychologist Dr. Shively and the State Agency psychiatrist Dr.

13  Loomis. CAR 24, 265-69, 270-83. The ALJ was entitled to resolve any ambiguities in the

14  record, and substantial evidence supports his interpretation. Finally, although plaintiff also

15  argues that the ALJ should have deferred to Ms. Davis's assessment as the most recent mental

16  health assessment in the record, such deference is necessarily premised on the fact that the

17  assessment is well supported by the evidence in the record as a whole. See Thomas v. Barnhart,

18  278 F.3d 947, 957 (9th Cir. 2002) (ALJ need not accept even a treating physician's opinion that

19  is conclusory and inadequately supported by clinical findings). In light of the above, the court

20  concludes that the ALJ properly gave Ms. Davis's opinion minimal weight.

21          D.      EFFECT OF OBESITY

22          Plaintiff claims that the ALJ erroneously failed to perform any analysis of the

23  effect of plaintiff's obesity on his mental and physical functioning, and thus failed to include any

24  resulting restrictions in the RFC finding in violation of SSR 02-1p. SSR 02-1p instructs an ALJ

25  to consider the combined effects of obesity with the claimant's other impairments at all

26  appropriate steps in the sequential evaluation process, including assessment of a claimant's RFC.

1    Plaintiff acknowledges that he did not explicitly raise obesity as an issue before the ALJ, but

2    argues that Celaya v. Halter, 332 F.3d 1177 (9th Cir. 2003) required the ALJ to inquire into the

3    issue and further develop the record.

4            Plaintiff's reliance on Celaya is misplaced.  In Celaya, the claimant, who had a

5    Body Mass Index ("BMI") of at least over 44, explicitly asserted an inability to work due to

6    diabetes, high blood pressure, dizziness, headaches, foot pain, and fatigue.  Celaya, 332 F.3d at

7    1179.  The Ninth Circuit held that the ALJ erred in failing to include the claimant's obesity in a

8    multiple impairment analysis, despite the fact that she failed to explicitly raise obesity as a

9    disabling factor, for three reasons: (1) it was raised implicitly in her report of symptoms; (2) it

10   was clear that her obesity was close to the listing criterion and was a condition that could

11   exacerbate her reported illnesses; and (3) in light of her pro se status, the ALJ's observation of

12   the claimant at the hearing and the information on the record should have alerted the ALJ to the

13   need to develop the record regarding her obesity.  Id. at 1182.

14           In this case, plaintiff was represented by counsel at the administrative level.  This

15   is not dispositive, however, because an ALJ still has a duty to "fully and fairly develop the record

16   and to assure that the claimant's interests are considered" even if the claimant has representation.

17   Celaya, 332 F.3d at 1183.  Nevertheless, in further contrast with Celaya, the record here contains

18   no evidence whatsoever of any functional limitations resulting from plaintiff's obesity.  Plaintiff

19   points to no statements by any of plaintiff's treating medical providers, or any of the other

20   medical sources, suggesting that plaintiff's obesity exacerbated his reported mental or physical

21   impairments.  As SSR 02-1p makes clear, certain BMI levels may indicate obesity and the extent

22   of obesity, but they "do not correlate with any specific degree of functional loss."  SSR 02-1p, at

23   *2.  Additionally, although obesity may at times cause or contribute to mental impairments and

24   pain, see SSR 02-1p, at *3, the court cannot say that plaintiff's alleged impairments and report of

25   symptoms in this case implicitly raised the issue of obesity in the way that conditions like

26   diabetes or high blood pressure might.

As the Ninth Circuit explained, the question is "whether the ALJ has acted reasonably in fulfilling his or her responsibility of scrupulous, conscientious, and diligent inquiry into the facts...." Celaya, 332 F.3d at 1183 n.3. Because the court concludes that the evidence in the record here did not reasonably trigger the ALJ's duty to independently inquire into the potential effects of plaintiff' obesity, no error on this basis resulted.

**E.    CREDIBILITY**

Plaintiff contends that the ALJ improperly discredited the testimony of plaintiff and plaintiff's mother, as well as third party written statements submitted by his mother and sister.

"Credibility determinations are the province of the ALJ" and are entitled to deference if the ALJ provides sufficient reasoning supported by substantial evidence. Fair v. Bowen, 885 F.2d 597, 604 (9th Cir. 1989). A two-step analysis is used to determine whether a claimant's testimony regarding subjective pain or symptoms, and resulting functional limitations, is credible. First, the claimant "must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged...." Smolen, 80 F.3d at 1281 (citations omitted). "[T]he claimant need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." Id. at 1282. Second, once this initial showing is made and there is no affirmative evidence of malingering, "the ALJ may reject the claimant's testimony regarding the severity of her symptoms only if he makes specific findings stating clear and convincing reasons for doing so." Id. at 1283-84; see also Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009).

"General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." Lester, 81 F.3d at 834; see also Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). In weighing a claimant's credibility, the ALJ may consider, among other factors, her reputation for truthfulness;

1  inconsistencies in her statements and testimony, or between her statements or testimony and her

2  conduct; her daily activities; her work record; unexplained or inadequately explained failure to

3  seek treatment or to follow a prescribed course of treatment; and testimony from physicians and

4  third parties concerning the nature, onset, duration, frequency, severity, and effect of the

5  symptoms of which she complains.  See Smolen, 80 F.3d at 1284.  However, the ALJ may not

6  find subjective complaints incredible solely because objective medical evidence does not

7  quantify them.  Bunnell v. Sullivan, 947 F.2d 341, 345-46 (9th Cir. 1991).

8            In this case, the ALJ provided specific, clear, and convincing reasons for

9  discounting plaintiff's testimony regarding his symptoms and functional limitations.  First, the

10  ALJ noted that plaintiff's allegations of debilitating mental problems were inconsistent with the

11  medical evidence indicating that "despite feeling emotional and stressed at times, [plaintiff] is

12  still able to think, act and communicate on his own behalf and is able to learn, remember and

13  carry out basic instructions."  CAR 23.  Here, the assessments by consultative examiner and

14  neuropsychologist Dr. Shively and the State Agency psychiatrist Dr. Loomis, coupled with the

15  unremarkable objective findings and treatment provided by Ms. Davis, provide a proper basis to

16  discount plaintiff's allegations of disabling mental limitations.  CAR 265-69, 270-83.  Although

17  subjective complaints may not be found incredible solely because objective medical evidence

18  does not quantify them, the ALJ properly considered it as a relevant factor in evaluating the

19  credibility of plaintiff's testimony.

20            Second, plaintiff's relatively conservative treatment was also a proper

21  consideration.  See Fair v. Bowen, 885 F.2d 597, 604 (9th Cir. 1989); Parra v. Astrue, 481 F.3d

22  742, 751 (9th Cir. 2007) ("We have previously indicated that evidence of conservative treatment

23  is sufficient to discount a claimant's testimony regarding severity of an impairment.")  Plaintiff

24  was prescribed a medication regimen and anger management classes for his mental impairments,

25  and as the ALJ pointed out, plaintiff's emotional condition "is largely unremarkable.  He does

26  not require emergency intervention nor has he been subject to frequent psychiatric

18

1 hospitalizations." CAR 23.

2       The ALJ also found that plaintiff "has not always been compliant with medication

3 regimens or attended his scheduled medical appointments in the past and is no longer taking

4 medication to control his feelings." CAR 23. As discussed above, a condition which can be

5 controlled or corrected by medication is not disabling. See Montijo, 729 F.2d at 600; Odle, 707

6 F.2d at 440.[10] Furthermore, failure to seek consistent treatment is a proper consideration when

7 evaluating credibility, see Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005), particularly

8 because the record here does not indicate that plaintiff's mental health conditions were so acute

9 as to render him unable to seek treatment or comply with a medication regimen.

10       Nevertheless, plaintiff contends that the ALJ improperly discredited plaintiff's

11 testimony on this basis, because plaintiff did not have health insurance or access to care as he

12 was essentially barred from the Mercy Family Health Clinic as a result of missing too many

13 appointments due to circumstances beyond his control. However, there is no evidence in the

14 record that plaintiff was barred from Shasta County Mental Health's services. To the contrary, it

15 was plaintiff who, a few days prior to his psychiatric nurse practitioner's September 2009

16 assessment, refused medication recommended by her despite being advised of the risks. CAR

17 751. Ms. Davis also noted partial medication compliance on several prior occasions. CAR 744,

18 747. Although plaintiff testified at the hearing that he did not feel his stomach was up to the

19 medications, plaintiff's allegations of debilitating abdominal pain are also undercut by his

20 testimony that he does not even take any over-the-counter medication for the pain, because he

21 has a "pretty high pain tolerance," is "almost immune to it now," and it feels like "it's a everyday

22 thing." CAR 52. As such, the ALJ properly considered plaintiff's failure to seek consistent

23 treatment and failure to follow his medication regimen as a factor in evaluating plaintiff's

24

25      [10] Plaintiff's mother testified that plaintiff's mental conditions were previously controlled very well when he was put on a consistent medication regimen in juvenile hall. CAR 66. The record contains further evidence of improvement with medication during his treatment at Shasta

26 County Mental Health. See e.g. CAR 738, 744.

1  credibility.

2          Finally, the ALJ also properly considered plaintiff's daily activities.  Admittedly,

3  the evidence regarding plaintiff's daily activities is somewhat ambiguous.  For example, plaintiff

4  highlights evidence that plaintiff cannot handle his finances and pay bills without assistance

5  (CAR 55-57, 190, 193-94, 202, 212); needs to be reminded about appointments (CAR 194);

6  needs help with caring for children and getting their homework done (CAR 191, 200, 217); has

7  difficulty concentrating and completing chores (CAR 54, 192-96, 212); is quick to anger and

8  does not handle stress well (CAR 43-44, 59, 61-62, 65, 192, 194-96); and spends much of the

9  day watching television (CAR 203).  On the other hand, the ALJ noted that plaintiff "has custody

10  of his three young children and by all accounts exercises patience when dealing with them and

11  does not become violently angry."  CAR 23.  Plaintiff leaves the house on a daily basis and

12  interacts with friends and family.  CAR 23, 202-03.  He cooks for his children; gets his children

13  to school on time; does the housework such as laundry, sweeping, vacuuming; goes grocery

14  shopping; and takes his children to the skate park.  CAR 23, 43, 53-54.  Plaintiff also testified

15  that he can do simple mathematics, could help his children with math homework, and liked to

16  watch science and history television programs.  CAR 23, 56-57, 223.

17          As noted above, it is the function of the ALJ to resolve any ambiguities and

18  inconsistencies in the record, and the court finds the ALJ's interpretation of plaintiff's testimony

19  here to be reasonable and supported by substantial evidence.  See Rollins v. Massanari, 261 F.3d

20  853, 857 (9th Cir. 2001) (affirming ALJ's credibility determination even where the claimant's

21  testimony was somewhat equivocal about how regularly she was able to keep up with all of the

22  activities and the ALJ's interpretation "may not be the only reasonable one").  As the Ninth

23  Circuit explained:

24          It may well be that a different judge, evaluating the same evidence,
        would have found [the claimant's] allegations of disabling pain

25          credible.  But, as we reiterate in nearly every case where we are
        called upon to review a denial of benefits, we are not triers of fact.

26          Credibility determinations are the province of the ALJ...Where, as

1 here, the ALJ has made specific findings justifying a decision to
2 disbelieve an allegation of excess pain, and those findings are
 supported by substantial evidence in the record, our role is not to
3 second-guess that decision.

4 <u>Fair</u>, 885 F.2d at 604.  In any event, as outlined above, the ALJ did not rely solely on plaintiff's

5 daily activities, but also took into account the medical evidence, plaintiff's relatively

6 conservative treatment, and plaintiff's failure to seek consistent treatment and follow a

7 medication regimen in discounting his testimony.  To the extent that plaintiff contends that other

8 reasons for discounting plaintiff's testimony provided by the ALJ were invalid, any such error is

9 harmless because the ALJ provided sufficient valid reasons for discounting plaintiff's testimony.

10 <u>See</u> <u>Molina v. Astrue</u>, 674 F.3d 1104, 1115 (9th Cir. 2012) (harmless error when ALJ provided

11 one or more invalid reasons for disbelieving a claimant's testimony, but also provided valid

12 reasons that were supported by the record).

13  Finally, plaintiff's argument that remand is required because the ALJ improperly

14 discounted the third party statements by plaintiff's mother and sister is without merit.

15 "[C]ompetent lay witness testimony cannot be disregarded without comment" and "in order to

16 discount competent lay witness testimony, the ALJ must give reasons that are germane to each

17 witness." <u>Molina v. Astrue</u>, 674 F.3d 1104, 1114 (9th Cir. 2012) (internal quotation and citation

18 omitted).  Here, the ALJ summarized the third-party statements and testimony in detail, clearly

19 indicating that he considered the information.  CAR 22-23.  Moreover, plaintiff's mother's and

20 sister's statements and/or testimony essentially echoed plaintiff's own testimony and, as

21 discussed above, the ALJ already provided specific, clear, and convincing reasons for

22 discounting plaintiff's testimony, which are equally germane to the third-party testimony.  As

23 such, any error in not explicitly re-stating, or incorporating by reference, the reasons given for

24 discounting plaintiff's testimony with respect to these third parties was harmless and remand is

25 not warranted.  <u>See</u> <u>Molina</u>, 674 F.3d at 1115-22.

26 \\\\

21

## F.      NECESSITY OF VOCATIONAL EXPERT TESTIMONY

For the reasons outlined above, the court finds that the ALJ properly assessed plaintiff's RFC, i.e. that plaintiff can "perform a full range of work at all exertional levels that involves simple routine tasks that have no frequent dealings with the public and do not require good reading and writing skills."  CAR 21.  To the extent that the limitation to jobs that "do not require good reading and writing skills" understates plaintiff's illiteracy, the court assumes for purposes of the analysis here that plaintiff cannot read and write at all.  In light of these findings, the only remaining issue is whether the ALJ was required to obtain vocational expert ("VE") testimony at step five of the sequential evaluation process to determine whether there is a significant number of jobs in the national economy that plaintiff could perform, or whether he was entitled to rely solely on the Grids.

The ALJ recognized that if "the claimant has solely nonexertional limitations, section 204.00 in the [Grids] provides a framework for decision-making (SSR 85-15)."  Section 204.00 states:

> The residual functional capacity to perform heavy work or very heavy work includes the functional capability for work at the lesser functional levels as well, and represents substantial work capability for jobs in the national economy at all skill and physical demand levels.  Individuals who retain the functional capacity to perform heavy work (or very heavy work) ordinarily will not have a severe impairment or will be able to do their past work – either of which would have already provided a basis for a decision of "not disabled."  Environmental restrictions ordinarily would not significantly affect the range of work existing in the national economy for individuals with the physical capability for heavy work (or very heavy work).  Thus an impairment which does not preclude heavy work (or very heavy work) would not ordinarily be the primary reason for unemployment, and generally is sufficient for a finding of not disabled, even though age, education, and skill level of prior work experience may be considered adverse.

20 C.F.R. Part 404, Subpart P, Appendix 2, § 204.00.  The ALJ then reasoned as follows:

> The undersigned notes that Social Security Ruling 85-15 provides a basis for a conclusion that the occupation base would not be significantly eroded by the claimant's non-exertional limitations,

22

which, as noted above, consist of a limitation to simple routine
tasks that do not involve frequent dealings with the public or
require good reading and writing skills.  Social Security Ruling 85-
15 states that the basic demands of unskilled work are defined as
understanding, remembering, and carrying out simple instructions,
responding appropriately to supervision, co-workers, and usual
work situations, dealing with changes in a routine work setting, and
making judgments that are commensurate with the functions of
unskilled work, i.e. simple work-related decisions, thus the
claimant's limitations would not have a significant impact on the
ability to perform a broad spectrum of unskilled work.
Accordingly, the undersigned finds the claimant's non-exertional
limitations do not significantly erode the occupational base.

The claimant's ability to perform work at all exertional levels has
been compromised by nonexertional limitations.  However, these
limitations have little or no effect on the occupational base of
unskilled work at all exertional levels.  A finding of "not disabled"
is therefore appropriate under the framework of section 204.00 in
the [Grids].

CAR 25.

The ALJ's reasoning and findings are supported by substantial evidence.

Plaintiff's RFC, which properly incorporated his limitations for the reasons discussed above,

permitted him to perform a large range of unskilled work at all exertional levels.  Although an

ALJ is generally required to consult with a VE when reviewing the claim of an individual with

only nonexertional impairments, see Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988), any

error to solicit VE testimony here was inconsequential to the disability determination and

therefore harmless.  As noted above, plaintiff's alleged illiteracy and lack of prior work

experience are not significant given that plaintiff is a younger individual found capable of work

at all exertional levels, and the ALJ reasonably found that limitations to simple, routine tasks and

no frequent dealings with the public do not significantly erode the occupational base.  Simply

put, one need not have the benefit of VE testimony to conclude that there are a significant

number of jobs in the national economy that plaintiff could perform despite those limitations.

Accordingly, a remand on this basis alone would be futile and is unwarranted based on the

evidence in the record as a whole.

23

**IV.  CONCLUSION**

For the foregoing reasons, IT IS HEREBY ORDERED that:

1.  Plaintiff's motion for summary judgment (Doc. 17) is denied;

2.  Defendant's cross-motion for summary judgment (Doc. 18) is granted; and

3.  The Clerk of the Court is directed to enter judgment for Defendant and close this file.


DATED:  August 6, 2012

**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE

Young.1283.ss.wpd

24